## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENNIS McKEITHAN,** | : | **Civil No. 1:11-CV-1441** |
| | : | |
| **Plaintiff** | : | **(Judge Caldwell)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **JOHN KERESTES, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

The plaintiff in this action, Dennis McKeithan, is an inmate in the custody of

the Pennsylvania Department of Corrections, and is currently housed at the State

Correctional Institution at Frackville.  The plaintiff claims to have been confined

within the RHUs of various prison facilities since October 7, 2009.  At all times

relevant to this action, McKeithan was an inmate housed in the Restricted Housing

Unit ("RHU") as a Restricted Release Inmate ("RRL") in Administrative Custody

("AC") pursuant to rules maintained by the Department of Corrections.[1]

---

[1] Under DC-ADM 802, the RRL is defined as:  "A list of inmates who are restricted from release from AC status without the prior approval of the Secretary/designee.  An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern."  DC-ADM 802, Glossary of Terms.  See <http.:www.cor.state.pa.us>; see also Doc. 111, Ex. H-1 (prior version of DC-ADM 802).

Of the claims that remain in this lawsuit, the plaintiff is alleging that members of the Program Review Committee ("PRC") who were assigned to periodically review his housing adjustment falsified reports and denied him various privileges in retaliation for filing grievances in March, 2011. (Compl., pp. 10-13.) McKeithan has also claimed that a denial of those privileges, such as having a radio and television, violates his rights under the Equal Protection Clause of the United States Constitution because other inmates on the RRL at other state correctional facilities are granted such privileges. (Id., at pp. 16-18.)  Finally, McKeithan claims that the conditions within the RHU at SCI-Mahanoy violate the Eighth Amendment's proscription against cruel and unusual punishments because of the 24-hour security low-wattage lighting used in the unit, which McKeithan claims has affected his memory and otherwise caused him mental injury.

The plaintiff has named as defendants John Kerestes, the Superintendent at SCI-Mahanoy; Brenda Tritt, the Deputy Superintendent at SCI-Mahanoy and head of the Program Review Committee ("PRC") at the prison; Ms. McKnight, a program manager and member of the PRC at SCI-Mahanoy; and Major Vuksta, the Major of the Guards at SCI-Mahanoy and member of the PRC.

The defendants have moved for summary judgment on the remaining claims, arguing variously that McKeithan has failed to exhaust administrative remedies

available to him through the Department of Corrections, or that McKeithan's claims fail as a matter of law and for failure of proof, and because the defendants are entitled to qualified immunity from the claims against them.

The defendants filed their motion on October 18, 2013, and filed a brief in support on the same day, together with a statement of undisputed facts, affidavits, and an appendix of evidence supporting the statement of facts.  (Docs. 110, 111, 112, 113.)  Following litigation of other matters, and following the entry of an order authorizing him additional time to submit a response to the motion, McKeithan filed a brief in opposition to the motion on January 6, 2014.  (Doc. 129.)  In his brief, McKeithan complains that he has been denied the right to correspond with other inmates of his choosing in order, presumably, to obtain affidavits or other information that he speculates could be helpful to his claims.  He also observes that the Court has denied his request that he be appointed pro bono counsel in this case, something that he contends has impaired his ability to discover evidence in support of his claims. Nevertheless, McKeithan has submitted numerous exhibits with his brief, including statements from other inmates ostensibly in support of McKeithan's claims, official prison records, prison policies, and his own unsworn declarations.

Upon consideration of the parties' briefs and the materials submitted in support of and opposition to the motion for summary judgment, we conclude that there remain

disputed issues of fact relevant to McKeithan's retaliation claim that make summary judgment on that single claim inappropriate.  However, we find that the defendants are entitled to summary judgment on McKeithan's claims alleging violations of his rights under the Eighth and Fourteenth Amendments based upon the conditions of his confinement within the RHU at SCI-Mahanoy.  Accordingly, for the following reasons it will be recommended that the defendants' motion be granted in part and denied in part.

## II.   <u>BACKGROUND</u>

The background to this report is taken chiefly from the defendants' statement of undisputed facts, to which the plaintiff did not respond with a counterstatement filed pursuant to Local Rule 56.1.  To the extent the defendants' statement of undisputed facts has effectively been unchallenged, the factual assertions have been accepted as true.  See LR 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.")  However, reading McKeithan's pro se filings liberally, we find that in some material respects McKeithan has placed in dispute certain of the defendants' factual assertions through countervailing assertions made in a series of unsworn declaration.  Accordingly, in

some limited instances, we have found that McKeithan has demonstrated the existence of disputed factual issues relevant to his retaliation claim.

At all times relevant to this action, McKeithan was an inmate housed in the Restricted Housing Unit ("RHU") as a Restricted Release List ("RRL") inmate in Administrative Custody ("AC") pursuant to DC-ADM 802 at SCI-Mahanoy.  Also at all times relevant to this action, each of the defendants was employed by the Department of Corrections and stationed at SCI-Mahanoy.

The Department of Corrections uses a standard classification system to determine an inmate's custody level and program code.  Each level specifies the restrictions or freedoms that apply to an inmate at that level.  (Def. SMF ¶ 4 and App. Ex. K, Declaration of Victor A. Mirarchi, III ("Mirarchi Decl.") ¶ 3; App. Ex. I, Declaration of Brenda Tritt ("Tritt Decl.") ¶ 3.)  As provided by DC-ADM 802 and the inmate handbook, AC status provides the highest level of security and control over inmates in the Department of Corrections.  If an inmate is placed in AC status, he will not have the same privileges as inmates in the general population of the prison.  (Mirarchi Decl. ¶ 4; Def. SMF, App. Ex. H-I.)

Decisions about the denial or revocation of discretionary privileges by the PRC are made at the institution level by members of the PRC, and are signed off on by the Superintendent of the institution.  (Mirarchi Decl. ¶ 6; Def. SMF, App. Ex. H-I.)

Decisions regarding the denial or revocation of discretionary privileges by the PRC are individual decisions made by discretionary decision makers at each institution based upon each inmate's behavior and security needs.  (Mirarchi Decl. ¶ 7; Def. SMF, App. Ex. H-I.)  These decisions are also based upon each particular correctional facility's current security concerns, which will vary from institution to institution. (Mirarchi Decl. ¶ 8; Def. SMF, App. Ex. H-I.)

Notwithstanding McKeithan's protestations to the contrary, and his contention that none of his fellow residents within the RHU at SCI-Mahanoy were denied radio and television privileges, there has been no "blanket denial" of privileges for AC or RRL inmates in the RHU at SCI-Mahanoy during the time period relevant to this action.  (Tritt Decl., ¶ 10.)  RHU officers responsible for the day-to-day care, custody and control of inmates housed in the RHU regularly inform the members of the PRC about their observations and interactions with the inmates.  (Id. ¶ 13.)  When a PRC report contains a notation relying on "housing reports" – these "housing reports" generally consist of the regular reports made by RHU officers that had occasion to regularly observe inmates.  (Id. ¶ 14.)

During the time that McKeithan was housed on AC status in the RHU at SCI-Mahanoy, he regularly participated in meetings with the PRC to assess his custody and housing status.  (Id. ¶ 15.; see also Copies of PRC Reports attached in Def. SMF

6

App. Ex. I-1 through I-23.)  These forms reflect, and the parties appear to agree, that in accordance with DC-ADM 802, during these PRC meetings the inmate's status and adjustment is discussed and evaluated.  During these meetings, the inmate also has the opportunity to request additional privileges to be approved or disapproved by the PRC.  (Tritt Decl. ¶ 16; Def. SMF, App. Ex. I-1 through I-23.)

In granting and denying these privileges, the PRC members use their discretion under the policy to decide which privileges would further behavior security needs and goals of each individual inmate.  (Tritt Decl., ¶ 17.)  DC-ADM 802 provides that "privileges may be revoked by the PRC based on a change in individual need, safety and security or inappropriate behavior of the inmate."   (DC-ADM 802 § 3(A)(9)(f)(4); Def. SMF, App. Ex. H-1.)  The policy also provides that in order to be considered eligible for additional privileges, an inmate "must have demonstrated positive behavior during the review period" in addition to being misconduct free.  Accordingly, whether an inmate is misconduct-free is but one factor in the PRC's decision to grant or deny privileges to an inmate on AC status in the RHU.  (Tritt Decl., ¶ 17; Def. SMF, App. Ex. H-1.)

In March, 2011, McKeithan filed a grievance making a number of demands on prison officials.  In response, it appears that McKeithan's regularly scheduled meeting with his PRC team was advanced, and that five days after he filed his

grievance, the PRC (the members of which were subject to McKeithan's grievance) determined that McKeithan's radio privilege should be revoked.  It appears that the PRC withheld McKeithan's radio and typewriter from March 17, 2011, until September 22, 2011, at which point the defendants contend McKeithan had demonstrated satisfactory behavior and increased positive communication with the PRC that warranted returning these items to him.  The parties disagree sharply as to whether this revocation of privileges was based upon legitimate penological interests, or whether it was instead retaliation for McKeithan's grievance activity directed toward members of the PRC team.

Inmates in the RHU are considered Level-5 inmates, who are in need of the highest level of security and need to be constantly observed to ensure the safety of staff, other inmates, and the institution generally.  (Def. SMF ¶ 32.)  Officers in the RHU make regular security patrols 24 hours per day in a continuous fashion to ensure that cells and areas within the RHU are checked at least once every 30 minutes, on an irregular schedule.  Inmates who are deemed to be in need of additional medical need or security need are observed more frequently.  (Mirarchi Decl. ¶ 11.)

To aid officers in their observation of inmates, the security lighting inside of the RHU cells remains on throughout the night, and cannot be controlled by inmates from within their cells.  This lighting policy is established by the Department of

Corrections in Department Police 6.5.1, which provides that "Security night lighting shall remain on in cells at all time."  (<u>Id.</u> ¶¶ 13-14.)  Although McKeithan has complained about the lighting in the cells and throughout the RHU, there is no medical evidence to show that McKeithan has suffered any adverse medical issue as a consequence of such lighting.

## III.   <u>STANDARD OF REVIEW</u>

The defendants have moved for judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality."  <u>Univac Dental Co. v. Dentsply Int'l, Inc.</u>, No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute about a material fact is

genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the Court must "consider

all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

It is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)." [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

## IV.   **DISCUSSION**

In order to state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must establish that a defendant acted under color of state law to deprive the plaintiff of a right secured by the United States Constitution or the laws of the United States.

Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  There is no question that each of the defendants named in this action are, in their personal capacities, amendable to suit under section 1983, as they were acting in their roles as employees of the Pennsylvania Department of Corrections when they allegedly denied McKeithan of his constitutional rights.  Accordingly, we focus on whether there are genuine issues of material fact with respect to the plaintiff's claims that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments of the Constitution.

### A. McKeithan's Equal Protection Claim Fails Procedurally and Substantively

McKeithan claims that the decision to deny him television and radio privileges at SCI-Mahanoy amounts to a violation of his right to Equal Protection guaranteed by the Fourteenth Amendment.  This claim fails both for procedural reasons and because McKeithan has failed to come forward with sufficient evidence to overcome the defendants' motion for summary judgment.

### 1. McKeithan Failed to Exhaust this Claim Administratively

Before addressing substantive issues presented by McKeithan's claim, the defendants contend that they are entitled to summary judgment because McKeithan failed to exhaust his available administrative remedies prior to filing this complaint.

In this regard, the defendants note that although McKeithan is a relatively experienced litigant in federal court, and is evidently quite familiar with the exhaustion requirements imposed upon inmates prior to bringing suit in federal court, McKeithan failed entirely to exhaust his administrative remedies with respect to the equal protection claim brought in this action.

The Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA") requires that prisoners present their claims through an administrative grievance process prior to seeking redress in federal court.  Specifically, the Act provides that:

> No action shall be brought with respect to prison conditions under [§ 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  In accordance with the PLRA, prisoners must comply with exhaustion requirements with respect to any claim that arises in the prison setting, regardless of the type of claim asserted, or the relief sought.  See Porter v. Nussle, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust

irrespective of the forms of relief sought and offered through administrative avenues.").

As the statute's language makes clear, the exhaustion of available administrative remedies prior to filing suit is mandatory. See Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis.") (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998)). Whether an inmate has exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. See Small v. Camden County, 728 F.3d 265 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).

Moreover, the exhaustion requirement of the PLRA is one of "proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 84 (2006). Failure to comply with the procedural requirements of the available grievance system will result in a claim being deemed procedurally defaulted. Id. at 90; Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004). An inmate cannot circumvent the PLRA's exhaustion requirement by failing to properly exhaust the prison's administrative review process, or by waiting until such remedies are no longer available to him. Woodford, 548 U.S. at 95.

14

However, if an inmate shows that the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. Brown v. Croak, 312 F.3d 109, 112-13. Likewise, "[w]here [the inmate] failed to receive even a response to the grievances addressing the . . . incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013).

## B. Department of Corrections' Policy DC-ADM 804

Pursuant to 37 Pa. Code § 93.9, the Department of Corrections maintains a grievance system that offers inmates a three-phase grievance and appeals procedure. See DC-ADM 804. Pursuant to DC-ADM 804, inmates must first file grievances with the Facility Grievance Coordinator at the facility where the events upon which the complaint is based occurred. If the inmate is dissatisfied with the initial review of his grievance, he may appeal the decision to the Facility Manager (Superintendent). Upon receiving a decision from the Superintendent, the inmate may file an appeal with the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within 15 working days of the Superintendent's decision. Id.

As the defendants observe, McKeithan has substantial familiarity with the inmate grievance process available to him, as in an approximate two-year period at

15

SCI-Mahanoy, from November 6, 2009, through November 24, 2011, McKeithan filed 75 grievances, many of which were appealed through final review.  (Def. SMF ¶ 28; App. Ex. A, Declaration of Keri Moore ("Moore Decl."), ¶ 6; App. Ex. A-1, McKeithan Mahanoy Grievance Chart.)   Notably, although McKeithan was indisputably a frequent and prolific griever while housed at SCI-Mahanoy, he never filed a single grievance alleging that as an inmate on RRL at the prison, he had been denied the same privileges as other prisoners on the RRL who were housed at other Pennsylvania prisons.  (Def. SMF ¶ 29; Moore Decl. ¶ 7.)

Because exhaustion is mandatory prior to filing suit in federal court, and because the record is undisputed that McKeithan did not grieve, much less exhaust, the equal protection claim he attempts to prosecute in this case, the defendants are entitled to summary judgment on this claim for procedural reasons alone.

## 2.    The Equal Protection Claim Otherwise Fails on its Merits

Setting aside the fact that McKeithan failed to exhaust the equal protection claim, this claim nevertheless fails on the merits because McKeithan has not come forward with evidence to adequately show that he is similarly situated to other inmates at other institutions, and because it is clear that a rational basis exists that permit the discretionary decision makers at SCI-Mahanoy to make individual determinations about which privileges to reward to different inmates who are on RRL

16

status within each institution. In order to create the appearance of a disputed factual issue, McKeithan would have the Court rely upon his own assertions regarding the privileges and amenities offered to RRL inmates at other institutions in the Commonwealth, but McKeithan's assertions do not provide any substantial basis to permit this equal protection claim to survive.

The Equal Protection Clause requires that all people similarly situated be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (quotations omitted). Claims for equal protection violations are subject to differing levels of scrutiny depending on the status of the claimant. Statutes or actions that substantially burden a fundamental right or target a suspect class must be reviewed under "strict scrutiny," which means that in order to be valid, they must be narrowly tailored to serve a compelling governmental interest. Plyler v. Doe, 457 U.S. 202, 216-17 (1982); Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2000). In contrast, if a statute or state action neither burdens a fundamental right nor targets a suspect class, it does not violate the Fourteenth Amendment's

17

Equal Protection clause, so long as the state action bears a rational relationship to some legitimate end.  Romer v. Evans, 517 U.S. 620, 631 (1996); Abdul-Akbar, 239 F.3d at 317.

It is well settled that prisoners do not constitute a suspect class for Fourteenth Amendment purposes, and thus McKeithan's equal protection claim is governed by rational-basis review.  See Myrie v. Comm'r, N.J. Dep't of Corr., 267 F.3d 251, 263 (3d Cir. 2001); Abdul-Akbar, 239 F.3d at 317.  Accordingly, to sustain his Equal Protection claim, McKeithan bears the burden of showing that he has been arbitrarily treated differently from similarly situated inmates, that the defendants did so intentionally, and that this difference in treatment bears no rational relation to any legitimate penological interest.  See Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).  McKeithan has failed to present evidence to sustain this substantial burden.

First, to the extent McKeithan is purporting to assert claims on behalf of other inmates at SCI-Mahanoy on the RRL, he has no standing to bring such claims for other inmates.  See, e.g., Thomas v. Warren, No. 13-4150, 2013 WL 3897698, at *3 n.8 (D.N.J. July 29, 2013) ("Plaintiff lacks standing to litigate any claim asserted on behalf of [other] inmates, since his complaint fails to establish that the inmates lack capacity to litigate their own challenges or that he has a personal stake in the other

inmates' claims."); <u>Bush v. Rendell</u>, No. No. 10-2246, 2011 WL 7423475 (M.D. Pa. Dec. 19, 2011); <u>Keys v. Pa.</u>, No. 10-2487, 2011 WL 766978, at *1 (M.D. Pa. Jan. 19, 2011) ("Keys can only represent himself in this action and he lacks standing to sue on behalf of any other inmate."); <u>see also</u> <u>Caputo v. Fauver</u>, 800 F. Supp. 168, 170 (D.N.J. 1992 ("Every court that has considered the issue has held that a prisoner proceeding pro se is inadequate to represent the interests of his fellow inmates in a class action.")

But even if McKeithan's equal protection claim is limited to the assertion that he personally was unlawfully denied certain privileges within the RHU at SCI-Mahanoy, the claim fails.  McKeithan essentially invites the Court to accept his tacit argument that inmates on the RRL and housed within the Commonwealth's 26 state prisons are all "similarly situated" due to their classification and housing status, and therefore to assume that if any RRL inmate is subject to different terms or conditions of incarceration from other RRL inmates, such disparate treatment constitutes an equal protection violation.  The Court should resist McKeithan's invitation to accept this legally specious assertion, since it misrepresents the law and distorts the facts relevant to the claim.

The defendants have asserted, and the evidence indicates, that prisons throughout the Commonwealth are each unique and have their own respective

institutional-level discretionary management considerations and priorities.  (Def. SMF ¶ 8; App. Ex. K ¶¶ 5-9; DC-ADM 802 (version relevant to the events of this case attached as Def. App. Ex. H-1, Section 3).)   Accordingly, at the outset, McKeithan's unsupported claim that RRL-classified inmates within the RHUs at various Pennsylvania prisons are "similarly situated" for equal protection purposes is untenable, given that the evidence is undisputed that the concerns at each institution are unique and, more importantly, the decisions regarding the denial or revocation of discretionary privileges by the PRC at the Department's prisons are made at the institutional level and approved by the Superintendent of each respective institution. (Def. SMF ¶ 8; App. Ex. K ¶ 6.) Regardless of McKeithan's protestations to the contrary, the evidence shows that these are case-by-case determinations made by institutional-level decision makers based upon each particular correctional facility's security concerns, which may vary from institution to institution.  (Def. SMF ¶¶ 9-10; App. Ex. K ¶ 9.) We agree with the defendants that McKeithan's claim fails at the outset because he has not presented competent evidence that would permit a finding that he is similarly situated to RRL inmates housed in the RHUs at other institutions.

Moreover, even if the Court were to find that there were disputed issues as to whether McKeithan was similarly situated to other RRL inmates confined within the

RHUs at other Pennsylvania prisons, his claim would still fail because he has no evidence to show that the alleged deprivation of a television or radio within the RHU at SCI-Mahanoy was an intentional deprivation that bore no rational relation to any legitimate penological interest at SCI-Mahanoy.  See Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

We agree with the defendants that the undisputed evidence shows that the decisions about whether inmates will be rewarded with discretionary privileges are based upon each individual inmates' behavior and the respective security needs for that inmate and the institution in which he is housed.  To expose these day-to-day discretionary institutional decisions to *post hoc* equal protection analysis is legally unwarranted and would be antithetical to the principle that corrections decisions should be afforded deference by the courts.  Accordingly, McKeithan's bald claims that there was a blanket denial of privileges at SCI-Mahanoy is baseless, and even if it is assumed to be true that inmates at SCI-Mahanoy had received fewer or more restrictive privileges than inmates at other facilities, these decisions are nevertheless discretionary and plainly bear a rational relationship to legitimate penological interests, namely the behavioral and security needs of each inmate and facility.

For all of the foregoing reasons, it is recommended that the Court enter summary judgment in the defendants' favor with respect to McKeithan's equal protection claim.

## B.   McKeithan's Eighth Amendment Claim Fails

McKeithan brings an Eighth Amendment claim alleging that the defendants either subjected him to cruel and unusual punishment, or otherwise disregarded a serious medical need, by subjecting him to 24-hour security lighting in the RHU at SCI-Mahanoy.  McKeithan claims, with no apparent evidentiary support, that being exposed to night lights and other security illumination in the RHU, he has developed non-specific memory problems, problems with his vision, and restless sleep. (Compl., Count III.)

McKeithan faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities.  To sustain such a claim, he must plead facts which:

> [M]eet two requirements:   (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted).  In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.*  "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001).

By including a subjective intent component in this Eighth Amendment benchmark, the courts have held that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim.  See Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005)(finding no Eighth Amendment violation where inmate-plaintiff complained about cellmate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to an attack.)  In short, when "analyzing deliberate indifference, a court must determine whether the prison official 'acted or failed to act despite his knowledge of a substantial risk of serious harm.'  Farmer v. Brennan, 511 U.S. 825, 841 (1994).  A prisoner plaintiff must prove that the prison official 'knows of and disregards an excessive risk to inmate health or safety.'  Id. at 837."  Garvey v. Martinez, 08-2217, 2010 WL 569852, at *6 (M.D.Pa. Feb. 11, 2010).

In order to violate the Eighth Amendment's prohibition against cruel and unusual punishment, however, the conditions being challenged must involve the "unnecessary and wanton infliction of pain; be totally without penological justification; and deprive an inmate of the minimal civilized measure of life's necessities."  Farmer, 511 U.S. at 825.  As this language makes clear, in the context

of a prison environment, "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992). Furthermore, a plaintiff seeking to articulate a cognizable claim for an Eighth Amendment violation based upon prison conditions must point to facts that rise to the level of a hardship that is atypical or significant in relation to the normal incidents of prison life. Sandin v. Connor, 515 U.S. 472, 484 (1995); see also Tillman v. Lebanon County Correctional Facility, 221 F.3d 410, 417-18 (3d Cir. 2000) ("Prison conditions may amount to cruel and unusual punishment if they cause 'unquestioned and serious deprivations of basic human needs . . . [that] deprive inmates of the civilized measure of life's necessities.'") (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

Against this standards, regardless of how he fashions his arguments, McKeithan's complaints about being exposed to either a 7-watt or 9-watt night light or even a light bulb of higher wattage that remained on for a substantial portion of each day within his cell the RHU at SCI-Mahanoy for security purposes fail to state a claim under the Eighth Amendment.

It is true that in some circumstances courts have found that exposing inmates to excessive and constant illumination may rise to the level of an Eighth Amendment violation. See, e.g., Bacon v. Minner, 229 F. App'x 96 (3d Cir. 2007) (citing Keenan v. Hall, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (constant illumination so that inmate

cannot discern day from night and which causes "grave sleeping problems" and other mental and psychological problems found unconstitutional).   On the other hand numerous courts have found that constant low-intensity lighting, when used for legitimate penological concerns, does not violate the Eighth Amendment.  See, e.g., Turner v. Safley, 482 U.S. 78, 89 (1987); Chavarria v. Stacks, 102 F. App'x 433, 436-37 (5th Cir. 2004) ("policy of constant illumination [was] reasonably related to the legitimate penological interest of guard security"); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir. 1987) (continuous lighting in holding cell not unreasonable given security concern); Spencer v. Wetzel, No. 12-CV-0616, 2014 WL 1056424, at *4-5 (M.D. Pa. Mar. 17, 2014) (continuous lighting in the RHU not an Eighth Amendment violation where the wattage was low, there was a legitimate penological need for the illumination, and the plaintiff had no evidence that he suffered sleeping, medical, or psychological problems as a result of the security lighting);  Wills v. Terhune, 404 F. Supp. 2d 1226, 1230-31 (E.D. Cal. 2005) (exposure to 24 hour 13-watt security bulb did not constitute cruel and unusual punishment in absence of evidence of "grave sleeping problems" or other harm); King v. Frank, 371 F. Supp. 2d 977, 985 (W.D. Wis. 2005) (9-watt florescent nighttime lighting not a violation where inmates could cover their eyes with cloth while sleeping and where plaintiff failed to show that the light caused any serious medical problems); see also Stewart v. Beard, 417 F. App'x

117, 120 (3d Cir. 2011) (unpublished) (noting that prison lighting conditions will be found permissible where they are reasonably related to a legitimate penological interest).

Having reviewed the evidence submitted, we find that there is no real dispute that corrections officials have legitimate penological reasons for using continuous low wattage lights within the RHU, as well as other forms of lighting that are on for the majority of each day to help ensure the safety of staff, other inmates, and the institution.  Although McKeithan invites the Court to interject itself into a dispute that he has attempted to create regarding the penological interests at SCI-Mahanoy, the Court should decline this invitation.  McKeithan has no competent facts to undermine the defendants' asserted bases for the illumination used within the RHU at SCI-Mahanoy, and as observed above numerous courts have found that prison's have legitimate needs in security lighting, particularly within restricted housing units that hold inmates who present special concerns.

Thus, we find there is no question that institutional safety and security are valid penological interests and objectives.  See Pell v. Procurier, 417 U.S. 817, 823 (1974). The defendants have submitted evidence in support of the assertion that inmates housed within the RHU are considered by Department policy to be at higher custody levels than inmates in the general population, and that there is a requirement for

increased observation by staff when an inmate is held within the RHU. The observation of RHU inmates includes frequent mandatory observations by RHU officers. (Def. SMF ¶ 32, 33; Mirarchi Decl.) The evidence shows that there are lights on inside the RHU cells for 24-hours per day that the RHU inmates are unable to turn off, pursuant to policy. (Def. SMF ¶ 35.) In addition, the regular lights in each cell are on from 6:00 a.m. until 10:00 p.m. each night, and a night light is on from 10:00 p.m. until 6:00 a.m.. (Id. ¶ 31.) Moreover, the RHU night light is a 7-watt lamp, something that McKeithan purports to dispute, but he has no competent evidence with which to do so. (Id. ¶ 30; Def. App. Ex. G, Declaration of Christopher Slodysko ("Slodysko Decl.").)

The lights within the RHU thus are used to further legitimate penological interests, namely the safety and security of staff and inmates. By using low-level 24-hour illumination, the RHU officers are able to see into cells and detect dangerous activity, cell fights, suicides, or escapes. (Def. SMF ¶ 36; Mirarchi Decl.; App. Ex. L, Grievance No. 355993.) Although he purports to dispute the need for this lighting, we do not find that McKeithan has effectively disputed that inmates in the RHU create heightened security interests, and that these interests are reasonably advanced by the use of illumination within the RHU and the inmates' cells.

But beyond the undisputed institutional interest in using such lighting, and our finding that the evidence shows that the lighting used is reasonable under the circumstances regardless of McKeithan's subjective complaints, the fact remains that McKeithan has no real evidence to support his bald contention that the use of security lighting has injured him in any way.   Nothing in McKeithan's medical records indicates that he has been adversely affected by lighting within the RHU.  (Def. SMF, App. Ex. J, Declaration of Vicki Stanishefski ("Stanishefski Decl.".)  Although the plaintiff has complained about experiencing a loss of memory or eyesight that he attributes to the lighting within the RHU, nothing in the record substantiates this medical conclusion, which is apparently based on nothing more than McKeithan's own speculation.  (Def. SMF ¶ 38; Stanishefski Decl. ¶ 4.)  Moreover, McKeithan's own treating psychiatrist, Dr. Ingrid Li, observed on August 21, 2012, that she found there to be "no evidence of memory loss," (SMF ¶ 38; Stanishefski Decl. ¶ 5), thus further undermining McKeithan's own assertions.

With respect to his complaints about eyesight degradation, we note that McKeithan is a 59 year-old inmate, and there is nothing in the record that indicates either that McKeithan's eyesight is truly worsening or, if in fact it is, that it is due to anything other than the normal effects of aging.  (Def. SMF ¶ 39; Stanishefski Decl. ¶ 6; Def. App. Ex. J-2.)  To the extent that McKeithan is complaining that the lights

in the RHU have an effect on his blood pressure, which was 139/87 during a check up on February 14, 2013, the evidence indicates that his blood pressure is being controlled with medication as part of his preventive medical regime. (Def. SMF ¶ 40; Stanishefski Decl. ¶ 7; Def. App. Ex. J-3.)  It also appears that McKeithan has further undermined his medical claims through his practice of routinely refusing to have labs taken, or to participate in his regular medical check ups.  (Def. SMF ¶ 41; Stanishefski Decl. ¶ 8; Def. App. Ex. J-4.)

In addition to demonstrating that there are legitimate penological interests for using the lighting within the RHU, and that McKeithan has no evidence to show that this illumination has caused him actual injury, the defendants note that if they were forced to stop using the lighting within the RHU, staff would be disadvantaged in their efforts to maintain safety and to check in on inmates in each cell.  (Def. SMF ¶ 37; Mirarchi Decl. ¶ 17.)

Considering the evidence in the record, it is submitted that McKeithan has not made out a cognizable claim for an Eighth Amendment violation based upon the use of night lights in the RHU, or the use of daytime lighting within inmates' cells in the RHU.  The defendants have come forward with unchecked evidence that the lighting used in the RHU is for an important penological interest that would be compromised if such lighting were unavailable, and the plaintiff has no evidence other than his own

conjecture to support his claim that being subjected to low-level night lights and daylights in his cell have caused him injury. The defendants are entitled to summary judgment on this claim.

### C.   Disputed Issues of Fact Make Summary Judgment on McKeithan's Retaliation Claim Unwarranted

Finally, we turn to McKeithan's claim that he was deprived of his radio and typewriter in March, 2011, in retaliation for having filed grievances against the defendants.

"Retaliation for the exercise of a constitutional right is itself a violation of rights secured by the Constitution actionable under section 1983." White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990). In Allah v. Seiverling, the Third Circuit Court of Appeals held that, "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." 229 F.3d at 224-25 (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 386 (6th Cir. 1999) (en banc)). Accordingly, the law of this Circuit is clear that a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges that he was denied. Id. at 225.

A prisoner claiming that prison officials have retaliated against him for exercising his rights under the First Amendment must prove that: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct." Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 200)).  An adverse action is one sufficient to deter a person of ordinary firmness from exercising his rights.  Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000); see also Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001)).  The crucial third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.  See Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007); Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)).

Once a plaintiff has made a prima facie case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." Carter, 292 F.3d at 158.  When analyzing a retaliation claim, courts are to bear in mind that the task of prison administrators and staff is difficult, and the

decisions of prison officials require deference, particularly where prison security is concerned.  Rauser, 241 F.3d at 334.

The defendants first argue that McKeithan was not actually engaged in protected activity when he filed Grievance No. 356327 in March, 2011, because prison officials determined that the grievance was frivolous.  Although we appreciate that the defendants perceived that during this time McKeithan was being a truculent, demanding and belligerent inmate whose requests were frivolous and, therefore, not worthy of First Amendment protection, we do not find sufficient legal support for the defendants' apparent view that whether grieving activity will be deemed protected activity turns on whether or not prison administrators label the grievance as "frivolous".

The defendants also argue that defendant Tritt and the other members of the PRC were simply acting in accordance with Department of Corrections policy and "in the interest of furthering McKeithan's behavioral goals" by sanctioning him with the loss of personal property five days after he filed a grievance against them. (Def. Brief at 19; Def. SMF ¶¶ 4-26; App. Ex. H-1; App. Ex. I; App. Ex. I-19.)  The defendants again note that decisions about the denial or revocation of discretionary privileges by the PRC are case-by-case decisions made by discretionary decision makers at the institutions based upon each individual inmate's behavior and security needs.  In this

regard, the defendants note that these decisions are informed by security considerations and the needs of each particular correctional facility. The defendants argue that this is precisely the kind of individualized decision making that they were performing when they elected to strip McKeithan of his personal property in March 2011. The remainder of the defendants' brief is devoted, essentially, to arguing facts that they contend go into PRC decisions regarding individual inmates' adjustment and development.

The defendants maintain that in March, 2011, officers had determined that McKeithan had become increasingly argumentative, demanding, uncooperative and "entitled to the point of belligerence." (Def. SMF ¶ 20; App. Ex. I ¶ 20; App. Ex. I-19.) This, according to the defendants, resulted in the PRC's decision to revoke McKeithan's radio privilege. (Ultimately, it appears that officers also took McKeithan's typewriter, although whether he voluntarily relinquished this item, or whether the PRC took the typewriter over his objection seems to be in dispute.) Defendants also note that in September 2011, McKeithan's property was returned to him once the PRC determined that "he was on the path to better behavior," and the defendants, therefore, conclude that "[t]hus, this six month deprivation of privileges was not the result of retaliation, but instead a result of McKeithan's own behavior." (Def. Br. at 23.)

For his part, McKeithan contends that after he filed the grievance in March, the PRC team advanced the date of his next scheduled meeting, and the decision immediately thereafter decided to revoke his privileges. McKeithan argues that this administrative action, and the PRC team's decision to revoke his personal property five days after he filed a grievance against them constitutes circumstantial evidence relevant to his claim of retaliation.

In support of this argument, McKeithan asserts that although he was a frequent griever as an inmate in the RHU at SCI-Mahanoy, and had filed upwards of 75 grievances within a two-year period, he had not previously been subjected to property deprivation on the basis of grievances until March, 2011. He points out that for much of that time, the RHU at SCI-Mahanoy had been overseen by Deputy Superintendent Bickel, who subsequently was promoted to Superintendent of SCI-Huntingdon. McKeithan maintains that after defendant Tritt took over from Deputy Superintendent Bickel, he was quickly subjected to retaliatory treatment for having filed a demanding grievance. The plaintiff thus relies on the circumstantial evidence showing that his past grievance practices had not resulted in property deprivation; that defendant Tritt (who was along with other PRC members the subject of McKeithan's grievances) subsequently assumed responsibility over RHU inmates and promptly acted out of retaliation five days after McKeithan filed Grievance No. 356327 in March, 2011.

34

Upon consideration, we conclude that McKeithan has identified sufficient circumstantial evidence in the record to support his retaliation claim, and to place in dispute the defendants' proffered legitimate reasons for revoking his privileges in March 2011. Given the disputed issues of fact the we find in the record, particularly the evidence that indicates that McKeithan's PRC meeting was moved up following his filing of Grievance No. 356327, that five days after filing the grievance McKeithan's privileges were revoked, and that McKeithan had not previously been subjected to similar property deprivations despite having been a routine griever over a period of nearly two years, we find that summary judgment on the plaintiff's retaliation claim is unwarranted.[2]

## IV.   **RECOMMENDATION**

Accordingly, for the foregoing reasons, it is hereby recommended that the defendants' motion for summary judgment (Doc. 110.) should be granted with respect

---

[2] The defendants also argue that they are entitled to qualified immunity from each of McKeithan's claims, although their argument seems to be focused principally on McKeithan's equal protection claim. However, because we find that there are disputed issues of fact that bear directly upon the plaintiff's claim for First Amendment retaliation, and because the Third Circuit has in other cases involving First Amendment retaliation claims brought by inmates found that qualified immunity from such claims may be unwarranted on summary judgment where there are unresolved issues fact that bear upon the claim, see, e.g., Atkinson v. Taylor, 316 F.3d 257, 270 (3d Cir. 2003), we submit that it would be premature to grant the defendants qualified immunity on this remaining claim.

to all claims except for the plaintiff's claim for First Amendment retaliation.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 5th day of May, 2014.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge